**NOT FOR PUBLICATION**

**UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY**

| | | |
|---|---|---|
| MARTELL'S TIKI BAR, INC., | : | |
| | : | |
| Plaintiff, | : | Civil Action No. 13-5676 |
| | : | |
| v. | : | **OPINION** |
| | : | |
| GOVERNING BODY OF BOROUGH OF | : | |
| POINT PLEASANT BEACH, et al., | : | |
| | : | |
| Defendants. | : | |
| | : | |

PISANO, District Judge

Plaintiff, Martell's Tiki Bar, Inc. ("Plaintiff" or "Martell's"), has brought this action, in which it challenges ordinances adopted by the Borough of Point Pleasant Beach (the "Borough"). These ordinances impose public parking restrictions within designated areas in the Borough during certain months of the year.

At issue is the Borough's current Ordinances 2013-26 and 2013-29, both of which regulate and restrict non-metered parking in areas of those districts in close proximity to the Borough's beach, boardwalk, and boardwalk commercial attractions. Specifically, the ordinances provide that, from May 15th to September 15th of each year, only those people who qualify as residents and residential taxpayers within District Four and a portion of District Three of the Borough are permitted to park in non-metered spaces between the hours of 12:30 a.m. and 4:00 a.m.

The parties agree that resolution of this dispute depends on a determination of two issues: whether the ordinances violate the Equal Protection Clause of the United States Constitution, and whether the ordinances violate the Public Trust Doctrine.[1]  Before the Court are two corresponding

---

[1] Because there is another lawsuit pending between the parties based upon the 2012 Ordinances, Defendants had initially filed their summary judgment motion in that docket and had raised issues that are not relevant to the current

motions for summary judgment, brought by Plaintiff and Defendants, the Governing Body of the Borough of Point Pleasant Beach and the Borough of Point Pleasant Beach (together, the "Defendants").   The Court decides these motions without oral argument pursuant to Fed. R. Civ. P. 78.  For the reasons set forth below, Defendants' motion is granted in part and denied in part and Plaintiff's motion is denied.

## I.      Background[2]

### A.      *Background of Parking Ordinances in the Borough*

The Borough of Point Pleasant Beach is a town on the New Jersey Shore, and occupies land providing access to and adjoining the Manasquan River and Inlet, its tributaries and branches, as well as the Atlantic Ocean.  Starting in or about 2001, the Borough began considering a nonresident parking ban.  *See, e.g.*, Point Pleasant Beach Parking Committee Meeting, October 25, 2001, *located at* Certification of Sean D. Gertner ("Gertner Cert") Ex. C ("Defs.' Ex. C").  The increasing popularity of the Borough as a premier New Jersey shore destination led to increasing problems for the quality of life in the Borough; as traffic and lack of parking in the Borough worsened, these conditions began "to affect resident's quality of life."  *See* Report of Stan Slachetka, P.P., dated May 3, 2013, at 8 (citing to a 2007 Reexamination Report), *located at* Gertner Cert. Ex. VVV ("Defs.' Expert Rep.").  The overall influx of tourists, as well as the existing residents, "create[d] a

---

matter.  Accordingly, and pursuant to the agreement with the parties, the Court will only address the two issues in this matter regarding the 2013-26 and 2013-29 Ordinances.  To the extent that Defendants assert that the issue of a potential conflict of interest with Councilman Corbally, a claim Plaintiff asserts in its other lawsuit in this Court, Plaintiff has made clear that any alleged conflict is irrelevant to the validity to Ordinances 2013-26 and 2013-29.  Accordingly, because Plaintiff makes clear in its briefs that any potential conflict of interest with Councilman Corbally is not an issue here, the Court will not address it.

[2] The Court is compelled to comment on Defendants' counsel's lack of specificity in citations to the record in this motion.  The record in this case is extensive, and a citation to, for example "Exhibits c, d, e, f, g, h, i, j, k, l, m, n, o, p, q, r, s, t, u, v, w, x, y, z, aa, bb, cc, and ppp" to the Certification of Sean D. Gertner, Esq., *see* Defs.' Statement of Material Facts ¶ 4, requires the Court to treasure hunt through hundreds of transcript pages for the appropriate materials—a difficult and time-consuming ordeal.  The Court reminds counsel that "[j]udges are not like pigs, hunting for truffles buried in the record."   *Doeblers' Pennsylvania Hybrids, Inc. V. Doebler*, 442 F.3d 812, 820 n.8 (3d Cir.2006). Counsel are advised that, for future briefings, *all* citations to exhibits and other supporting materials should include specific page numbers rather than simply general references to exhibits that consist of hundreds of pages.

severe shortage of parking" in the Borough.  *Id.* at 9 (quoting the 2007 Reexamination Report at 29).  Accordingly, the Borough felt that a nonresident parking ban would work to relieve problems with access to the beach, beach-related facilities, and businesses.  They also believed it would help generally with certain "quality of life" problems in the Borough, such as loud parties at "animal houses," disorderly conduct, public intoxication, and public urination. *See generally* Defs.' Ex. C (discussing various parking proposals); *see also id.* at 22:24–23:5; 29:13–32:13, 42–48. Apparently, the Borough failed to garner public support for such a parking ordinance.

In November 2011, the Borough sent a proposal to the voters of the Borough with the following question:  "Shall the Governing Body of the Borough of Point Pleasant Beach institute by the appropriate action regulations limiting parking on public streets to residents and taxpayers of the Borough of Point Pleasant Beach?" *See* Sample Election Ballot, dated November 8, 2011, *located at* Gertner Cert. Ex. EEE.  The explanatory statement provided:  "This overnight parking program would restrict parking town-wide for only taxpayers and residents.  This program would run from Memorial Day to Labor Day.  Hours of enforcement from midnight until 8:00 a.m. with five free transferrable passes to be distributed to each eligible reference." *Id.*  This referendum was defeated by the voters of the Borough.  *See* Pl.'s Statement of Material Facts not in Dispute ("Pl.'s SMF") at ¶ 9; Transcript of March 20, 2012 Borough of Point Pleasant Beach Council Meeting at 36:12-19, *located at* Gerner Cert. Ex. N ("Defs.' Ex. N").

B.     ***Enactment of Ordinances 2012-12 and 2012-20:  the Pilot Program***

The governing body of the Borough continued to study and review street parking limitations.  The Borough believed that helping facilitate parking for residents and employees of local businesses would also help address the incessant quality of life issues in the Borough during the summer months when tourism was at its peak, while making overnight parking available to the

residents of a certain designated area of the Borough, known as District Four. *See, e.g.*, Defs.'
Expert Rep. at 1; Defs.' Ex. C at 5:13–6:13, 22:24–23:5; 29:13–32:13, Defs' Ex. N at 109–55.
During these months, District Four experienced numerous problems with intoxicated patrons after
midnight, loud profanity, littering, noise violations, and disorderly conduct, including but not
limited to simple assault, theft, resisting arrest, public urination, defiant trespassing and drunk
driving. *See, e.g.*, Transcript of June 12, 2012 Borough of Point Pleasant Council Meeting at
67:11–69:19, *located at* Gertner Cert. Ex. I ("Defs.' Ex. I"); Defs.' Expert Rep. 3; Copy of S.N.A.P.
Slides at 2 (describing how 58% of all police responses in the Borough occurred in District Four),
*located at* Gertner Cert. Ex. GGG.

        Accordingly, the governing body of the Borough decided to move forward with a trial
parking plan for District Four. *See* Minutes of January 24, 2012 Borough of Point Pleasant Beach
Council Meeting at 9, *located at* Gertner Cert. Ex. Q (Defs.' Ex. Q); Minutes of March 6, 2012
Borough of Point Pleasant Beach Council Meeting at 7, *located at* Gertner Cert. Ex. O ("Defs.' Ex.
O"). Apparently, motivation for developing such a parking plan came from the residents of District
Four, which voted in favor of the 2011 parking referendum that had been defeated. The Council
also expressed that a similar ordinance had already been passed in a different area of town. *See*
Defs.' Ex. O at 7; Defs.' Ex. N at 131.

        This first ordinance was Ordinance 2012-12, entitled "Pilot Parking Program for District
Four." *See* City of Borough of Point Pleasant Beach Ordinance 2012-12, *located at* Gerner Cert Ex.
DD ("Defs' Ex. DD"). The ordinance restricted overnight parking in District Four to vehicles
displaying residential parking placards between the hours of 12:00 a.m. and 6:00 a.m. during the
summer season, defined as the Monday before Memorial Day until the Monday after Labor Day.
The ordinance also provided that no more than five placards would be issued for each property in

District Four.  Only people who qualified as a resident or a residential taxpayer, as defined by the ordinance, would be permitted to apply for a placard.  Other residents or taxpayers of the Borough that lived outside District Four would be permitted to apply for and obtain one placard.  Within the ordinance, District Four is defined as "that area of the Borough bordered on the east by the Atlantic Ocean, on the west by the New Jersey Transit Railroad tracks, on the north by the Manasquan River and Inlet, and on the south by the north side of Arnold Avenue."  *Id.* at 1.  The preamble to Ordinance 2012-12 explained that it was necessary to establish regulation and parking on these residential streets during these hours and months of the year "for the good and welfare of its citizens . . . ."  *Id.*  By its terms, Ordinance 2012-12 contained a sunset provision that repealed the ordinance in its entirety on December 31, 2012, unless the date of the repeal was extended by ordinance of the Council.  *Id.* at 3.

Thereafter, the Borough conducted several public hearings on the ordinances.  The first of these meetings occurred on March 20, 2012, when the initial ordinance was introduced.  In describing the Ordinance, Councilman Michael Corbally explained that:

> The parking plan will hopefully give some quality of life after midnight back to the taxpayers and residents of District 4. . . . And listen, this isn't just a District 4 problem.  Because the folks that live in Districts 1, 2, and 3, when we do a reval or a reassessment, and we will in the next two or three years—guaranteed it'll be done by then—the property expense, the taxes are going to go up substantially in the other districts if District 4 continues to slide.  It's a fact of life.  If property values go down in District 4, because right now it's, it's the heaviest tax, it's just going to move.

Ex. N. at 38:15-18, 40:15-24.  Mayor Vincent Barrella indicated that the nature of the ordinance was directed at the deteriorating quality of life in District Four:

> [T]he problem is not so much about the parking.  This is not about parking.  This is not about somebody looking to find a parking space in or about their house.  This is about people who don't know how to behave themselves and come into point pleasant beach acting out in a Jersey, with a Jersey Shore mentality, screaming, yelling, throwing things around at two, three in the morning, cursing at the top of

> their lungs when they can't find their car keys, okay, and basically urinating and
> defecating on people's lawns. That's what this is about.

*Id.* at 130:1-11. When opened to the public, residents were split on their positions on the ordinance.
Those who supported the parking restriction emphasized that the deterioration of the quality of life
in District Four made it "imperative" that something be done to ameliorate the situation. *See id.* at
109:22–110:25. Other residents supported the ban because they believed that the ordinance would
(1) alleviate parking issues in the area for the homeowners; (2) help with criminal/mischievous
activity, including fights, noise disturbances, urination and defecation on residents' lawns, and
littering; and (3) reduce the number of policeman that are currently required to be present in
residential areas to monitor the area. *See id.* at 147–55. Opponents of the ordinance, however,
objected to and took issue with: (1) the limited number of parking placards that would be granted
for each tax bill; (2) the possibility of charging for placards if the pilot program passed; (3) potential
overflow and negative impact on the other districts, particularly when the other districts voted down
such plans in the past; (4) the ordinance would not adequately resolve the problems in the District;
(5) the potential negative effect on tourism, revenue, taxes, and businesses in the Borough; (6) costs
associated with the placards and replacing placards; (7) availability of enough parking for guests of
residents or residential taxpayers; and (8) possibility of increased drinking and driving. *See id.* at
112:17–25, 116, 132:13–135, 151:15–23, 147:11–148:8. At the close of the hearing, the Board
voted to introduce the ordinance for adoption at the next public hearing.

On April 17, 2012, Ordinance 2012-12 was opened for a second reading. At the close of the
hearing, the Council voted on and approved Ordinance 2012-12. Those members voting in favor of
it emphasized that it was a pilot program attempting to alleviate the issues with the quality of life in
District Four, and that it could be improved later if the program did not work. *See id.* at 175:10–
197:6, 182:19–183, 184–85:11.

Thereafter, on May 15, 2012, the Council introduced Ordinance 2012-20 to amend Ordinance 2012-12.  The ordinance, as amended, extended the placard privilege to employees of commercial entities within District Four, in order to "promote the vitality of businesses in, and the economy of, District Four."  *See* Ordinance 2012-20, Amending 2012-12, at 1 *located at* Gerner Cert. EE.  This allowed business owners to obtain placards that would permit their employees to park in non-metered spaces in District Four during the restricted period.  The proposed amendment also eliminated fees at the parking meters and pay machines at Silver Lake Parking Lot, a municipal parking lot, between the hours of 11:00 p.m. and 6:00 a.m.  The Borough decided to do this in order to "foster better use of its parking resources."  *Id.* at 1, 7.  Silver Lake is located directly across the street from the Point Pleasant boardwalk and its various attractions and bar and restaurant facilities.  The amendment also prohibited the sale of placards, and authorized the Borough Administer to adjudicate any dispute by a resident relating to the issuance or failure to issue a placard, and granted the Administer with the discretion to issue more placards to residential taxpayers where there are multiple dwelling units on one property.  *See id.* at 3; *see also* Transcript of May 15, 2012 Borough of Point Pleasant Beach Meeting at 32:4-33:16, *located at* Gerner Cert. Ex. J ("Defs.' Ex. J").  Finally, pursuant to the amendment, all placards would now include the homeowner's address and make them transferable.  Pursuant to its sunset provision, the amended ordinance was to be automatically repealed on December 31, 2012.  At the meeting, the Council also confirmed that Ocean County had not approved the parking restrictions on County roads that went through District Four, apparently because of concern that parking would adversely affect county taxpayers and tourism to the area.  *See id.* at 38–39.  Therefore, County roads in District Four would be unregulated, meaning anyone could park on these roads at any time.

When the amendment was opened to public comment, one resident thanked the Council for passing the ordinance, commenting that it "means a great deal to the residents of the Fourth District" and that he thought it would "be a terrific asset in restoring civility and peaceful evenings in Fourth District." *Id.* at 91:2–10.  Another resident noted that he went door to door about the parking ordinance, and "everyone [he] spoke to was absolutely in favor of the ordinance for parking . . . ." *Id.* at 112–13.  Those in opposition to the amendment, and the ordinance generally, felt that the Council was being disingenuous with its motive for enacting the ordinance.  One resident commented that she did not "think that [the Borough] was doing this for the quality of life," but was doing it to generate more revenue from tourists and other non-residents.  Such opposition indicated that they believed there was a "vendetta" between some Council members and the businesses on the boardwalk.  *Id.* at 114:9–22.  Another commented that it was her belief that the ordinance would cause tourists to stop going into the Borough, resulting in less revenue.  *Id.* at 122.  The Council voted to adopt the amendment at the close of the meeting.

On June 12, 2012, the Council held another hearing, in part to discuss the amendments to the ordinance and their practical effects.  Specifically, business owners had questions regarding how to obtain placards for their employees, and the procedure for receiving said placards was explained. *See* Defs.' Ex. I at 64–65.  When the amended ordinance was opened to the public for comment, several residents and business owners expressed the same concerns that had been raised at earlier hearings.   One resident raised the issue of the appropriateness of creating a parking ordinance for District Four when the residents had voted down the referendum for a town-wide ordinance.  *See id.* at 88:17–89:16.  Residents also raised the issue of having certain personal information, such as their address, displayed on the placard.  During the hearing, a resident also took issue with the possibility of lost revenue in the Borough by allowing free parking in Silver Lake.  Other opponents of the

ordinance emphasized that there was not going to be enough parking spots in District Four to allow all the residents with placards to park. *See id.* at 104. Another resident brought up a similar point, commenting that "[o]riginally, when [the Borough] came up with this parking plan, [it] said that it was going to help the quality of life by freeing up parking spaces and that it would also force the tourists to go into Silver Lake." Councilman Corbally responded to this comment by explaining that he "never said it would free up parking spaces . . . . The plan was just to have the nightclub crowd not walk back into the residential areas." *See id.* at 117:17–118:2. Likewise, Mayor Barrella indicated that the parking regulation was "a quality of life issue. It's a quality of life parking plan that was actually part of a, part of a, a larger attempt to address quality of life and public safety issue that might have avoided some of the actions that have already been -- some of the things that this Council has been put in a position of having to do." *Id.* at 130:3-9. The Council also explained the theory behind making parking free in Silver Lake at certain hours:

> By making it free, hopefully, it will concentrate, concentrate people in the municipal lot . . . so that it's easier for the police department. And the other thing is by making this lot free, it should alleviate the pressure on, on areas adjacent to District Four because people now, instead of having to look in Three for free parking, can go right to the municipal lot for free.

*Id.* at 197:9–22. The Council then moved and adopted the amended ordinance, Ordinance 2012-20.

C.   ***Enactment of Ordinances 2013-02 and 2013-14: the Permanent Program***

Because the terms of Ordinances 2012-12 and 2012-20 contained sunset provisions that automatically repealed the ordinances on December 31, 2012, the Borough began to take efforts to reestablish the parking restrictions as the 2013 summer season approached. At a February 5, 2013 hearing, the Council addressed concerns about vacant houses in and around District Four as a result of Hurricane Sandy. Several Council members felt that the parking plan should go into effect to alleviate concerns with all the potential summer vacancies and increased vandalism. *See* Transcript

9

of February 5, 2013 Borough of Point Pleasant Beach Council Meeting at 151, *located at* Gertner

Cert. Ex. H ("Defs.' Ex. H").  The Council also resolved that the parking plan would be amended to

provide free parking in the Silver Lake municipal lot from 11 p.m. to 6 a.m.  They also discussed

and then confirmed including certain parts of District Three into the regulated area.  According to

one councilman, he spoke to nineteen residents in District Three that would now be affected.  He

said that, of those nineteen, nine were against the regulation applying to them, five were for the

regulation, and four were undecided.  Overall, however, the Council believed that the parking

program worked in District Four last year, and that the residents of District Four were pleased with

the results.  *See generally id.* at 144–79.  As one councilman said:

> I'm just amazed that the Councilpeople are even debating the fat of whether this
> worked or not last year.  I mean it's just-it's mindboggling to me that people that live
> there will tell you they can sleep at night with their windows open at two o'clock,
> there wasn't the garbage on the street, there wasn't the law-breaking going on.  And
> now, with the houses being empty, not having that is really ludicrous.  But even with
> the houses full, the quality of life improved.  And you guys are sitting up here like
> making a decision that it didn't.   It as positive from a cash flow.

*Id.* at 173–74.  Thereafter, a councilman moved to introduce the new ordinance, Ordinance 2013-02,

with an additional amendment that changed the hours of restriction to 12:30 a.m. to 4:00 a.m.  The

Council then voted and approved Ordinance 2013-02.

On March 19, 2013, the Borough held a hearing on Ordinance 2013-02, which, due to a

necessary ministerial change, was now titled Ordinance 2013-14.  *See* Transcript of March 19, 2013

Borough of Point Pleasant Beach at 84–85, 110–12, *located at* Gertner Cert. Ex. F ("Defs.' Ex. F").

In the preamble to the ordinance, the Borough Council states its intent "to improve the quality of

life of residents of the Borough," and concluded that it needed to adopt permanent regulations in

recognition of the need to limit parking in certain designated areas of the Borough between the

hours of 12:30 a.m. and 4:00 a.m. from May 15th of the calendar year to September 15th of the

calendar year.  *See* City of Borough of Point Pleasant Beach Ordinance 2013-02, *located at* Gerner Cert Ex. FF ("Defs' Ex. FF").  The Borough Council also states that, as a result of the prior parking regulation, they "received far fewer complaints of unruly and disorderly behavior from residents in the affected districts during the periods governed by those regulations," and they therefore found that "for the good and welfare of its citizens it is necessary and advisable to establish regulations that improve the quality of life for residents."  *See id.*  The ordinance continued free parking at Silver Lake Lot between the hours of 11:00 p.m. and 6:00 a.m. during the time of the regulated parking.  It also made it illegal to reproduce, sell, or transfer any placard for profit, and allowed multi-family properties to obtain multiple placards.  A violation of the parking ordinance could result in a $250.00 fine and "community service as permitted by statute."  *See id.*  Ordinance 2013-14 also extended the area covered by the parking regulation to a portion of District Three, specifically "that area of the Borough bordered on the North by the south side of Arnold Avenue, on the West by the west side of St. Louis Avenue, on the South by the south side of Forman Avenue and on the East by the Atlantic Ocean, with the exception that no portion of either Arnold Avenue or Ocean Avenue shall be subject to this Ordinance."  *See* City of Borough of Point Pleasant Beach Ordinance 2013-14, *located at* Gerner Cert Ex. GG ("Defs' Ex. FF").  Under the parking regulation, the several county roads that transverse the covered area would not be subject to the ordinances, because the County had formally advised the Borough that it did not wish to impose any parking regulations on its roads and therefore would not approve of the ordinance.  *See* Defs.' Ex. F at 87:20–88:7.

When Ordinance 2013-14 was opened for public comment, several residents spoke on the positive experience the pilot program ordinance had been for them.  As one resident stated:

> I am vigorously and passionately in favor of this ordinance. . . . It's been years of
> begging and pleading for something like this to happen.  It amazes me there is still so

much resistance and so much doubt.  I've heard every member of this Council on at least one occasion acknowledge that the plan did make the neighborhood quieter. . . .It was a pilot program.  It worked.  There were those who said it's going to lose tourist revenue.  It proved it did not.  There were those who said that it was going to stop people from coming to Point Pleasant Beach.  It did not.  One of the biggest corporations on the boardwalk publically acknowledged that it did not affect their bar business.  I don't know why this resistance continues. . . . It's not a revenue loss. It actually produced more revenue than it cost for the plan, so I ask you for the sake of residents of at least District 4, please pass this ordinance.  I walk through a neighborhood of gutted-out homes on a daily basis, and I'm terrified of what the thought is going to be if somebody is staggering down the street at 1:00 or 2:00 in the morning and what they might do at those home.  If nothing else, those people could be contained at the Silver Lake parking lot, which protects the residential area and also makes it a lot easier for our police to do their jobs.

Defs.' Ex. F at 97:24–99.  Another resident commented, "It was wonderful last year.  The pilot program worked very well where people were able to wake up and not see their lawns littered with liquor bottles or other unmentionable items in the streets and got a little more sleep.  So I would urge the Council to please vote for this ordinance."    *Id.* at 101:11–20.  Those that spoke out against Ordinance 2013-14 did not object to or question District Four's pilot program and its permanent adoption, but rather opposed the extension of the parking regulation into District Three. *Id.* at 102:16–103:19.

Next, when questioned by the Council about whether the pilot program had alleviated any of the quality of life issues, Chief Kevin O'Hara stated:

The information I received from my supervisors that work the night shifts and supervise the boardwalk and bicycle patrols is that they did see a reduction in incidents back in those neighborhoods that were effected. I don't have the statistical numbers to quote percentages, but all in all, the feel from the officers was that there was a reduction in some of the quality of life issues that we've dealt with in prior years.

*Id.* at 105:16-24.   He also found that the use of free parking at Silver Lake helped, explaining that the free parking helped "keep the majority of the people going to one area" making it easier for the Borough police "to control it and have officers in just one general area instead of being spread out

12

thinner elsewhere.  So if everybody is parking in the Lake lot, as opposed to all the residential streets, it is easier for us to control."  *Id.* at 106:3-9.

At the close of the hearing, a vote was taken on Ordinance 2013-14 by the Council, which resulted in a tie.  Two of the three councilman who voted against the ordinance commented that they were voting no based only on the extension into District Three.  *See id.* at 107.  Before providing the tie-broker vote to approve the ordinance, Mayor Barrella explained that the ordinances were affecting only a "very small area" of District Three.  He then proceeded to explain his vote:

> So, and in looking at it and weighing it, it did work. Jenkinsons[3] has gotten onboard with it.  They have indicated that it was not a problem for them.  We have made Little Silver lot free between 11:00 and 6:00, even though the hours of restriction are only 12:30 to 4:00, that making Little Silver lot free, some on this Council, last year, expressed concern that it would affect our revenue, and it did effect our revenue. Our parking revenue was never higher.  It was the highest it's been in history.  The situation was controlled.  People were funneled into Little Silver lot.  It worked. Okay.  I still, for the life of me, don't understand, other than the politics of it, why anybody would oppose this.  So, and for that reason, my vote is yes.

*Id.* at 109-110:6.  Accordingly, Ordinance 2013-14 was adopted, making the parking regulations in District Four, and part of District Three, permanent.

### D.    *Legal Challenges and Introduction of Ordinances 2013-26 and 2013-29*

Thereafter, several prerogative writ suits were filed in New Jersey Superior Court challenging the adoption of Ordinance 2013-14.  These lawsuits challenged the restricted parking ordinances as violating the Public Trust Doctrine,[4] violating New Jersey common law, and violating

---

[3] "Jenkinsons" refers to Jenkinson's Boardwalk, a business that operates on the boardwalk of Point Pleasant Borough. It operates a series of boardwalk facilities, including boardwalk rides, an aquarium, and a nightclub.  *See* Jenkinson's Boardwalk, http://jenkinsons.com (last visited December 20, 2014).

[4] The public trust doctrine is a right "deeply engrained in [New Jersey's] common law."  *Van Ness v. Borough of Dea*, 78 N.J. 174, 178 (1978).  The public trust doctrine is derived from the ancient principle of English law that land covered by tidal waters belonged to the sovereign, but for the common use of all the people. *Borough of Neptune City v. Borough of Avon-by-the-Sea*, 61 N.J. 296, 303–04 (1972).  The public trust doctrine has been only recognized by common law, and has not been recognized as a right flowing from the Constitution.  *See, e.g.*, *Bubis v. Vill. of Loch Arbour*, Civil Action No. 06-2921 (FLW), 2008 U.S. Dist. LEXIS 32868, at *16–18 (D.N.J. Apr. 22, 2008).

the New Jersey Constitution in various ways.  These lawsuits also alleged that one councilman had a disqualifying conflict of interest that rendered the adoption of Ordinance 2013-14 void.  On June 17, 2013, the Court found that the ordinance did not violate the equal protection clause, did not violate the Public Trust Doctrine, and did not violate any claims brought under New Jersey common or statutory law.  However, the Court found that one of the councilmen had a disqualifying conflict of interest, and therefore Ordinance 2013-14 was invalid.  *See Speroni, et al. v. Borough of Point Pleasant Beach, et al.*, Docket No. OCN L-3135-12 PW, 2013 N.J. Super. Unpub. LEXIS 1872 (Law Div. June 17, 2013).  Plaintiff Martell's Tiki Bar also filed a lawsuit challenging Ordinance 2013-14 on the same grounds; Defendants removed that lawsuit to federal court on June 6, 2012.

After Ordinance 2013-14 was found invalid due to the conflict of interest, the Council introduced and passed on reading Ordinance 2013-26, entitled "An Ordinance of the Borough of Point Pleasant Beach, County of Ocean and State of New Jersey, Regulating Parking in Designated Areas of the borough and Amending Chapter X to Provide Free Parking in Silver Lake Parking Lot During Limited Hours."  *See* City of Borough of Point Pleasant Beach Ordinance 2013-26, *located at* Gerner Cert Ex. WWW ("Defs' Ex. WWW").  While substantively similar to Ordinance 2013-14, Ordinance 2013-26 is exclusive to District Four in its application.  *See id.*  In the preamble to Ordinance 2013-26, the Borough Council states that, "as a result of certain litigation in the Superior Court of New Jersey, Ocean County, Vincent Grasso, A.J.S.C., determined that such regulations are a valid exercise of the police power in that the distinctions drawn by this Ordinance are rationally related to a legitimate governmental interest . . . ."  *Id.*  The Borough Council reiterates that, as a result of the prior parking regulations, it "received far fewer complaints of unruly and disorderly behavior from residents in the affected districts during the periods governed by those regulations," and that the ordinance "addresses quality of life issues within the Borough associated with parking

by facilitating parking restrictions for residents and employees in the district and prevents the disruption caused by intoxicated patrons after 12:30 a.m., loud profanity, littering and disorderly conduct . . . ." *Id.* The Council stated that it recognized "the concerns of commercial enterprises located within those areas designated in this Ordinance, but is not stopped from enacting a parking ordinance deemed necessary to safeguard public health, safety and morals . . . ." *Id.* The second reading and subsequent adoption of Ordinance 2013-26 took place on July 9, 2013. *See* Pl.'s SMF at ¶ 24.

Finally, on July 9, 2013, the Council also introduced for first reading and passed Ordinance 2013-29, entitled "An Ordinance of the Borough of Point Pleasant Beach, County of Ocean and State of New Jersey, Regulating Parking in Designated Areas of the Borough." *See* City of Borough of Point Pleasant Beach Ordinance 2013-29, *located at* Certification of Alexis L. Gasiorowski ("Gasiorowski Cert.") Ex. I.  Ordinance 2013-29 extends the parking regulations set forth in Ordinance 2013-26 to another area within the Borough identified as "a portion of District 3," *id.*,  defined in the same way as under Ordinance 2013-14.  The Borough Council explains in the preamble that they found and determined "that for the good and welfare of its citizens it is necessary and advisable to establish regulations and provide for the enforcement of certain residential parking regulations affecting a limited portion of District 3 within the Borough . . . ." *Id.* Ordinance 2013-29 was considered for second reading and adopted on July 30, 2013.  *Id.*  The parking restrictions set forth in Ordinance 2013-26 for District Four were accordingly applied to that area of District Three.

Currently pending in the New Jersey Superior Court Appellate Division are the appeals of the June 17, 2013 Opinion and Order upholding the validity 2012 Ordinances.  After passing Ordinance 2013-26, additional prerogative writs were filed in the Superior Court.  In that case,

Judge Grasso once again issued an Opinion upholding the validity of Ordinance 2013-26.  In his

opinion, he noted that the "ordinance in question is substantially similar to Ordinance 2013-14,

whose validity was upheld by the court in its written opinion dated June 17, 2013."  *See* Feb. 26,

2014 Order, *Purple Jet Fishing Charters, at al. v. Borough of Point Pleasant Beach*, Docket No. L-

2417-13, at 1, *located at* Certification of Arthur M. Peslak ("Peslak Cert.") Ex. A.   Accordingly, in

that case, counsel for both parties agreed that the Court could rely on its June 17, 2013 Opinion

regarding the plaintiffs' legal challenges to Ordinance 2013-14 as a basis to deny plaintiffs'

substantive relief to Ordinance 2013-26.  *See id.* at 1–2.   The sole remaining issue left for that

Court to decide was whether Ordinance 2013-26 was procedurally improper.  The Court found that

it was not, thereby finding Ordinance 2013-26 valid.

## II.      Standard of Review

Federal Rule of Civil Procedure 56(a) provides that "a court shall grant summary judgment

if the movant shows that there is no genuine dispute as to any material fact and the movant is

entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The substantive law identifies which

facts are material. "Only disputes over facts that might affect the outcome of the suit under the

governing law will properly preclude the entry of summary judgment."  *Anderson v. Liberty Lobby,

Inc.*, 477 U.S. 242, 248 (1986). A material fact raises a "genuine" issue "if the evidence is such that

a reasonable jury could return a verdict" for the non-moving party.  *Healy v. N.Y. Life Ins. Co.*, 860

F.2d 1209, 1219 n.3 (3d Cir. 1988).

The Court must consider all facts and their logical inferences in the light most favorable to

the non-moving party.  *Pollock v. Am. Tel. & Tel. Long Lines*, 794 F.2d 860, 864 (3d Cir. 1986).

The Court shall not "weigh the evidence and determine the truth of the matter," but need determine

only whether a genuine issue necessitates a trial. *Anderson*, 477 U.S. at 249.  While the moving

party bears the initial burden of showing the absence of a genuine issue of material fact, meeting this obligation shifts the burden to the non-moving party to "set forth specific facts showing that there is a genuine issue for trial." *Id.* at 250. If the nonmoving party has failed "to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial, . . . there can be no genuine issue of material fact, since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Katz v. Aetna Cas. & Sur. Co.*, 972 F.2d 53, 55 n.5 (3d Cir. 1992) (quotation omitted). If the non-moving party fails to demonstrate proof beyond a "mere scintilla" of evidence that a genuine issue of material fact exists, then the Court must grant summary judgment. *Big Apple BMW v. BMW of N. Am.*, 974 F.2d 1358, 1363 (3d Cir. 1992).

**III.     Discussion**

On August 21, 2013, Plaintiff filed this action in the New Jersey Superior Court, alleging eleven causes of action against the Borough based on Ordinance 2013-26 and 2013-29 (together, the "Ordinances"). The Borough then removed the action to this Court pursuant to 28 U.S.C. § 1441(b), "on the grounds that Plaintiff's complaint asserts a federal claim under claimed violations of the equal protection and due process clauses of the United States Constitution." *See* Notice of Removal, ECF No. 1-2 (filed Sept. 23, 2013). At the time of removal, the New Jersey Superior Court had already entered judgment in favor of the Borough regarding the general legal validity of Ordinance 2013-14, the substantively identical predecessor of the Ordinances at issue here.[5] The sole federal claim in this action—and the only basis for this Court's jurisdiction—is whether the Ordinances violate the Equal Protection Clause of the Fourteenth Amendment.

---

[5] While the New Jersey Superior Court made clear that it found Ordinance 2013-14 valid against the legal arguments raised against it, it found that the potential conflict of interest that disqualified Councilman Corbally's vote rendered the ordinance invalid.

A.     ***Equal Protection Claim***

Generally, Plaintiff argues that the Ordinances should be invalidated because their enactment constitutes an invalid, arbitrary, and unreasonable exercise of police power, thereby violating the Equal Protection Clause.   Defendants, not surprisingly, assert that the Ordinances represent a reasonable and legitimate exercise of police power, rationally related to legitimate government purposes and goals, and in no way offends Plaintiff's right to equal protection.

The Court notes that the New Jersey Legislature has enabled municipalities to enact and amend zoning ordinances through the exercise of the police power.  *See Manalapan Realty v. Twp. Committee*, 140 N.J. 366, 380 (1996).  In accordance with this power, municipalities are authorized to "prohibit or restrict general parking."  N.J. Stat. Ann. § 39:4-8(c)(1).  Such zoning ordinances "come[] to the courts clothed with every presumption of validity."  *Bass River Assoc. v. Mayor of Bass River Twp.*, 573 F. Supp. 205, 213 (D.N.J. 1983) (quoting *City of Ann Arbor, Michigan v. Northwest Park Constr. Corp.*, 280 F.2d 212, 223 (6th Cir. 1960)).  Indeed, "[u]nless it is based upon a suspect classification or impinges on a fundamental right . . . zoning legislation may be held unconstitutional only if it is shown to bear no possible relationship to the State's interest in securing the health, safety, morals or general welfare of the public and is, therefore, manifestly unreasonable and arbitrary."  *Id.* (quoting *City of Highland Park v. Train*, 519 F.2d 681, 696 (7th Cir. 1975)).

The Ordinances at issue here deal with a distinction between two classes of people, residents and non-residents.  Such a classification is not suspect; accordingly, the Ordinances "may be held violative of equal protection only if they bear no rational relationship to the legitimate interests of the [Borough] and are therefore arbitrary and unreasonable."  *Id.* at 215; *see also County Bd. of Arlington Cnty. v. Richards*, 434 U.S. 5, 7 (1977) (holding that ordinances based on a distinction between resident and non-resident need only "rationally promote the regulation's objective").  In

*Richards*, the municipality in issue enacted an ordinance directing the county manager to determine residential areas that were especially crowded with parked cars from outside the neighborhood. Free parking permits would then be issued to residents of the designated area, to persons doing business with residents there, and to some visitors for use between 8 a.m. and 5 p.m. on weekdays. Parking in a designated area without a permit during the designated hours was a misdemeanor. *See Richards*, 434 U.S. at 5–6. The purpose of the ordinance was

> to reduce hazardous traffic conditions resulting from the use of streets within areas zoned for residential uses for the parking of vehicles by persons using districts zoned for commercial or industrial uses…; to protect those districts from polluted air, excessive noise, and trash and refuse caused by the entry of such vehicles; to protect the residents of those districts from unreasonable burdens in gaining access to their residences; to preserve the character of those districts as residential districts; to promote efficiency in the maintenance of those streets in a  clean and safe condition; to preserve the value of the property in those districts; and to preserve the safety of children and other pedestrians and traffic safety, and the peace, good order, comfort, convenience and welfare of the inhabitants of the County.

*Id.* at 6. In reviewing the ordinance, the Virginia Supreme Court found that "the ordinance on its face offends the equal protection guarantee of the 14th Amendment" because the "ordinance's discrimination between residents and nonresident bears no reasonable relation to [the regulation's] stated objectives." *Id.* at 6–7. The Supreme Court disagreed, explaining that the Constitution does not "presume distinction between residents and nonresidents of a local neighborhood to be invidious." *Id.* at 7. Rather, "Equal Protection Clause requires only that the distinction drawn by an ordinance . . . rationally promote the regulation's objectives." *Id.* Significantly for this case, the Supreme Court explained that a "community may . . . decide that restrictions on the flow of outside traffic into particular residential areas would enhance the quality of life there by reducing noise, traffic hazards, and litter.  By definition, discrimination against nonresidents would inhere in such restrictions." *Id.* Such social objectives are not outlawed by the Constitution, and the Supreme

Court held that, "on its face," the discrimination against nonresidents rationally promoted the objectives of the ordinance and accordingly did not violate the Equal Protection Clause.

The reasoning in *Richards* compels a similar finding in this case.  As shown both by the record of the public hearings and the language of the Ordinances themselves, the Borough Council was concerned with certain quality of life issues within the Borough associated with the summer season and the rise of tourism.  Specifically, the Borough Council intended to improve the quality of life for residents in certain designated areas of the Borough by ensuring adequate overnight parking to the residents of the districts at issue, and to prevent the deteriorating conditions of the residential areas of these districts, where early mornings were relegated to intoxicated individuals and incidents of criminal activity and other types of disorderly conduct, including public urination and defecation, loud and raucous behavior, littering, fighting, trespassing, and drunk driving.  The facts of these problems were clearly established on the public record.  Further, the public record demonstrates how containment of non-residential overnight parking to the Silver Lake lot allowed the Borough police to concentrate their forces on one area, as opposed to spreading out all over the covered areas.  As the exhibits provided by both parties shows, Silver Lake is not in close proximity to any residential neighborhood and is bordered by a lake on the south.  The record also establishes that the quality of life issues that were plaguing the affected areas were reduced.  It is axiomatic that the decrease in early morning pedestrian traffic through the residential areas, combined with the ability of the Borough police to concentrate on one area, allowed for the improvement in the quality of life in the affected areas.  Further, the record of the public hearings and committee meetings throughout the years shows that the Borough was also interested in ensuring sufficient overnight or early morning parking for those who resided in or rented in the affected areas.

The Court finds that, in this case, drawing a distinction between residents and non-residents rationally promoted the Borough's objectives.  The justifications for the distinction between residents and non-residents—a desire to help alleviate some of the major parking problems in the relevant districts and to improve the quality of life during early mornings hours in the relevant districts—are clearly legitimate, and certainly not "manifestly unreasonable and arbitrary."  *See Bass River*, 573 F. Supp. at 213, 219.   Further, the Borough Council tailored the Ordinances to address the specific problems it was seeking to ameliorate; the parking regulation is only in effect in the summer months—the peak of tourist season when the most out-of-towners come into the Borough—and during the limited hours of 12:30 a.m. to 4:00 a.m.  Presumably to address any inadequate parking, the Borough Council also mandated that parking in the Silver Lake lot would be free of charge during the hours when the Ordinances are in effect; in fact, the lot is actually free of charge for an extended period of time, from 11:00 p.m. to 6:00 a.m.

In its attempt to show that the ordinance is not rationally related to its objectives, Plaintiff speculates—but cites to no actual evidence—that the Ordinances fail to accomplish the purpose articulated by the Borough Council, because the residents and residential taxpayers in the covered areas receive five placards that are transferrable.  *Id.*  This is pure speculation, and it ignores the evidence before the Court, in which both residents and the chief of police personally found that the parking regulation worked to improve the quality of life of the area.  Mere speculation as to reasonableness is not enough to overcome the presumption of validity that is attached to zoning ordinances such as the ones at issue here.  *See Bass River*, 573 F. Supp. at 213.  Further, New Jersey courts have upheld "ordinances banning overnight parking as a valid exercise of local power." *Spring Lake Hotel & Guest House Ass'n v. Spring Lake*, 199 N.J. Super. 201, 209 (App. Div. 1985). Notably, in these cases, court stress that, when reviewing ordinances for constitutional validity, they

are not passing judgment on the value or wisdom of the specific legislative enactments. Rather, "[t]he political process and the deliberations of elected representatives are better suited to contend with the complex questions of public policy and competing social interests." *Spring Lake Hotel*, 199 N.J. Super. at 209 (quotation omitted). This Court does not review the wisdom of the Borough Council; rather, the Court is constrained to determine whether the Ordinances represent a legitimate and constitutional exercise of the Borough's police power. The Borough Council is in a unique position of balancing apparently competing public policy concerns: the promotion of the Borough's economic base and the protection of its residential neighborhoods. The Court is not in a position to second-guess the decisions the Borough Council makes in addressing and balancing these concerns, and instead feels that issues concerning the effectiveness of the Ordinances are better suited for "the political, and not the judicial, forum." *Id.* at 210–11.

Overall, "[a] community may . . . decide that restrictions on the flow of outside traffic into particular residential areas would enhance the quality of life there by reducing noise, traffic hazards, and litter. By definition, discrimination against nonresidents would inhere in such restrictions." *Richards*, 434 U.S. at 7. As the Supreme Court has made clear, however, this inherent discrimination is not invidious unless it fails to rationally promote the regulation's objectives. *Id.* Just as the parking regulations in *Richards* were a permissible and reasonable exercise of the municipality's police power, the Court finds that the Ordinances here are rationally related to a legitimate government interest and do not violate the Equal Protection Clause of the Fourteenth Amendment.

**B.**     ***Public Trust Doctrine***

As discussed above, when Defendants removed this action to the Court, the Amended Complaint contained both federal and state claims. Accordingly, the Court had jurisdiction over

Plaintiff's federal claim under 28 U.S.C. § 1331, and supplemental jurisdiction over Plaintiff's state

law claims under 28 U.S.C. § 1367.  Now that judgment has been entered for Defendants on the

single federal claim that provided the basis for this Court's jurisdiction, the Court must determine

whether it should retain jurisdiction over the remaining state law claims, in which Plaintiff advances

violations of New Jersey's Public Trust Doctrine.

A district court has discretion to "decline to exercise supplemental jurisdiction over a claim .

. . if . . . [it] has dismissed all claims over which it has original jurisdiction . . . ."  28 U.S.C.

§1367(c)(3).  In fact, under Third Circuit law, "where the claim over which the district court has

original jurisdiction is dismissed before trial, the district court *must* decline to decide the pendent

state claims unless considerations of judicial economy, convenience, and fairness to the parties

provide an affirmative justification for doing so."  *Hedges v. Musco*, 204 F.3d 109, 123 (3d Cir.

2000) (quoting *Borough of W. Mifflin v. Lancaster*, 45 F.3d 780, 788 (3d Cir. 1995)); *see also*

*Annulli v. Panikkar*, 200 F.3d 189, 202–03 (3d Cir. 1999) (affirming decision of the district court to

decline to exercise pendent jurisdiction after granting summary judgment to the defendants on the

claims arising under federal law), *abrogated on other grounds by Rotella v. Wood*, 528 U.S. 549

(2000).

There are pending state court actions addressing the same ordinances pending in the very

court from which Defendants removed this action.[6]  The parties' briefs reveal that the crux of this

case is New Jersey's Public Trust Doctrine and its application to the ordinances at issue.

Considering that New Jersey courts have developed and shaped the Public Trust Doctrine, the Court

believes that New Jersey's interest in applying its own law when making a decision determining the

applicability of the Public Trust Doctrine is greater, particularly considering the particular facts of

---

[6] The Court notes that the issue of *res judicata*, particularly of issue preclusion, was not raised by either party and
accordingly not addressed by the Court.

this case. *See e.g.*, *Kennedy v. Schoenberg, Fisher & Newman, Ltd.*, 140 F.3d 716, 727–28 (7th Cir.1998) ("At that point [when all federal claims have been dropped from the case before trial], respect for the state's interest in applying its own law, along with the state court's greater expertise in applying state law, become paramount concerns.") (internal quotations omitted).  Comity concerns strongly support declining to exercise supplemental jurisdiction over the remaining state-law issues.  Accordingly, the Court declines to exercise supplemental jurisdiction over Plaintiff's remaining state law claims and remands the pending claims to the Superior Court of New Jersey, Law Division, Ocean County, where Plaintiff originally filed.

## IV.     Conclusion

For the foregoing reasons, Plaintiff's motion for summary judgment is denied and Defendant's motion for summary judgment is granted in part and denied in part.  Judgment is entered in favor of Defendants on the equal protection claim.  The remainder of the Amended Complaint, consisting of state law claims, is remanded to the Superior Court of New Jersey, Law Division, Ocean County.  An appropriate Order accompanies this Opinion.

/s/ Joel A. Pisano
JOEL A. PISANO, U.S.D.J.

Dated: January 9, 2014